IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

———————————————

| | |
|---|---|
| ROBERT PIERSON, | |
| Plaintiff, | |
| vs. | Case No. 2:12-CV-024-SWS |
| CORRY BASSETT, Deputy Sheriff, ROB ANDAZOLA, Deputy Sheriff, LINCOLN COUNTY SHERIFF'S OFFICE, LINCOLN COUNTY, a county in the State of Wyoming, and JOHN OR JANE DOES 1-5, | |
| Defendants. | |

---

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on the Defendants' *Joint Motion for Summary Judgment* (ECF No. 31).  The Court, having considered the briefs and materials submitted in support of the motion and Plaintiff's opposition thereto and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

On August 7, 2011, Defendant Deputy Sheriff Bassett stopped Plaintiff, Robert Pierson, while Plaintiff was traveling on his motorcycle near Alpine, Wyoming.  Plaintiff recorded the traffic

stop via his cellular phone.  (Defs.' Ex. A, Pierson's Audio of Traffic Stop) ("Pierson Audio").  The

Lincoln County Sheriff's office recorded the dispatch traffic as well.[1]  (Defs.' Ex. C, "Dispatch

Audio".)  These recordings provide a portrayal of the events in question and all material facts are

undisputed.[2]

At approximately 1:14 p.m. on the day of the stop, the Lincoln County Sheriff's Office

received a 911 call from a concerned motorist reporting he had observed a motorcycle weaving in

and out of traffic at a high rate of speed outside of Alpine.  (Dispatch Audio at 0:15; Defs.' Ex. D,

Lt. Andrews Aff. ¶ 9(a).)  The caller identified himself as Josh Poulson and provided his phone

number and address.  (Dispatch Audio at 2:47, 5:47.)  Mr. Poulson told the dispatcher he was

traveling with three other vehicles and the motorcycle passed them at 100 mph, was "splitting

traffic," and "almost hit a car head on."  (*Id*. at 1:15-35.)  Mr. Poulson further advised that the

motorcycle was black and had a single rider wearing a gray t-shirt and was bald with no helmet.  (*Id*.

at 1:44-49.)  Deputy Bassett responded to the call.  (Andrews Aff. at 2.)

Prior to looking for the motorcyclist in question, Deputy Bassett asked the dispatcher if the

reporting party was willing to sign a complaint, and the dispatcher advised that he was willing to do

---

[1] The copy of the dispatch audio is voice and telephone activated and does not continuously record "dead air," so it is shorter than the actual time period of the initial 911 call to the end of the stop. (Defs.' Ex. D, Lt. Andrews Aff. at 1-2.)

[2] Although he was deposed in this matter, Plaintiff submitted an affidavit in opposition to the Defendants' motion for summary judgment.  (ECF No. 35-11.) The Court finds much of Plaintiff's affidavit to be self-serving and conclusory and/or containing facts not material to a resolution of the summary judgment motion.

so.  (Dispatch Audio at 2:20-26.)  Mr. Poulson asked the dispatcher if he should stop in Alpine.  (*Id*. at 6:50.)  Deputy Bassett located a man on a motorcycle matching the description from the reporting party.  (*Id*. at 7:15.)  Deputy Bassett activated his lights and siren and attempted to pull the motorcycle over.  (*Id*. at 7:50.)  The motorcycle failed to stop and continued toward the Idaho border as Deputy Bassett attempted to pull him over.  (*Id*. at 7:58.)  The dispatcher told Mr. Poulson not to go close to where the officer was stopping the motorcyclist.  (*Id*. at 8:14.)  Deputy Bassett told the dispatcher that the motorcycle might be running from him.  (*Id*. at 8:19.)  Mr. Poulson advised the dispatcher he had stopped at the First Bank to await further instructions.  (*Id*. at 9:03.)

Deputy Bassett followed Plaintiff for over a mile.  At approximately 1:23 p.m., Plaintiff finally pulled over outside of the town of Alpine and close to the Idaho border.  (Andrews Aff. at 3.)  Deputy Bassett exited his vehicle and approached the motorcycle while Plaintiff activated his cell phone to audio record the stop.[3]  Deputy Bassett informed Plaintiff that he had received a complaint from a caller about Plaintiff's driving including an assertion that Plaintiff had passed multiple vehicles at the same time at speeds of 100 mph.  (Pierson Audio, Track 1 at 0:05-09.)  Plaintiff admitted he had passed people in RV's but that they were traveling slowly and he wasn't doing anything illegal.  Deputy Bassett asked Plaintiff if he had his driver's license on him; Plaintiff stated he did and asked if he could "get off the bike for a sec."  (*Id*. at 0:24-28.)  Deputy Bassett told

---

[3] Pierson's phone recorded only five minutes at a time before shutting off.  (Defs.' Ex. B, Pierson Dep. 32:15-16.)  Therefore, Pierson's audio recording is on three separate tracks and is not a complete recording of the entire stop.

Plaintiff he could but, in the same breath, asked Plaintiff if he had any weapons on him. (*Id*. at 0:29.)

Rather than answer the question, Plaintiff stated, "I don't consent to any searches." (*Id*. at 0:31.)

Apparently confused by Plaintiff's non-responsive answer, Deputy Bassett asked, "What's that?" Plaintiff again responded, "I don't consent to any searches." Deputy Bassett then noticed the gun on Plaintiff's hip (apparently as Plaintiff dismounted from the motorcycle) and said "I know you've got a gun" to which Plaintiff responded "yeah, obviously." (*Id*. at 0:39-40.) Deputy Bassett subsequently handcuffed Plaintiff and told him he was not under arrest but, for officer safety, he was placing Plaintiff in handcuffs. (*Id*. at 0:50-1:10.) At this point, what had started out as a polite conversation turned into a tense and argumentative exchange between Plaintiff and the deputy. Plaintiff stated he was "open carrying" and it should have been obvious to Deputy Bassett that he had a gun. Deputy Bassett responded he was not aware Plaintiff was carrying until Plaintiff got off the bike.[4] Plaintiff insisted he had no obligation to tell Deputy Bassett he had a weapon and stated the deputy's safety was "not in any way in jeopardy" and "not [his] concern." (*Id*. at 1:36-52.) Plaintiff stated to Deputy Bassett, "My only concern is my personal rights and individual liberties which you are violating right now." (*Id*. at 1:55-2:00.)

Just over two minutes into the stop, Deputy Bassett asked Plaintiff where his license was. Plaintiff responded he was not required to have a license. Deputy Bassett clarified that he was asking about Plaintiff's driver's license. Plaintiff stated his license was in his wallet which was in

---

[4] This is corroborated by Plaintiff's deposition testimony where he states Deputy Bassett seemed surprised when he saw the firearm. (Pierson Dep. at 44:3-5.)

his back right pocket.  Deputy Bassett expressed frustration that Plaintiff hadn't answered his question about weapons.  Plaintiff again stated that he "[doesn't] consent to any searches," and Deputy Bassett responded that he was not going to search him.[5]  Deputy Bassett told Plaintiff all he had to do was answer the question about whether he had weapons on him and it would have been a "different story."  (*Id*. at 3:15-25.)  Deputy Bassett further told Plaintiff he did not like the fact Plaintiff refused to answer the question regarding whether he had any weapons and got off his bike with a visible handgun on his hip.  (*Id*. at 3:26-31.)  Plaintiff expressed his belief that Deputy Bassett was not concerned with Plaintiff's rights or "search and seizure laws."  (*Id*. at 3:40-47.)  Deputy Bassett indicated Plaintiff was welcome to contact his supervisor if he desired.  Deputy Bassett stressed that he was not searching Plaintiff's belongings.

A little over four minutes into the stop, Deputy Bassett advised Plaintiff he was going to get Plaintiff's driver's license from his wallet.  (*Id*. at 4:22.)  Plaintiff stated Deputy Bassett did not have permission to go through his wallet.  Deputy Bassett handed the wallet to Plaintiff and told him to retrieve his license if he could.  Plaintiff inadvertently gave Deputy Bassett his concealed weapons permit but demanded it back stating Deputy Bassett did not have permission to look at that license.  Deputy Bassett apparently returned the concealed weapons permit to Plaintiff and returned to his vehicle to run a check on Plaintiff's driver's license.  At that point Track 1 of Plaintiff's audio recording ended.  At 1:29 p.m., Deputy Bassett requested backup and asked for Plaintiff's license

---

[5] The audio recording indicates Deputy Bassett removed Plaintiff's wallet from his back pocket during this exchange to retrieve his driver's license.

information from dispatch.  (Andrews Aff. ¶ 9(l) & (q).)

At the beginning of Track 2, Plaintiff stated, "1330, I am pulled over to the side of the road, Highway 26 and 89.  I have been stopped and handcuffed for open carrying."  (Pierson Audio, Track 2 at 0:01-16.)  Deputy Bassett returned after running Plaintiff's driver's license and stated he was waiting to hear back from dispatch.  (*Id*. at 0:30.)  While waiting, Deputy Bassett attempted to again discuss the situation with Plaintiff and to explain why Deputy Bassett placed Plaintiff in handcuffs. (*Id*. at 0:35.)  Plaintiff insisted Deputy Bassett did not have a right to ask him if he had a firearm. Plaintiff again proclaimed he does not consent to any searches.  (*Id*. at 1:05.)  Deputy Bassett attempted to explain that he asked the question for officer safety.  Plaintiff told Deputy Bassett officer safety "is of absolutely no importance to this situation" and there "is absolutely no right in this or any law in this country for officer safety," and "the only things that exist in this country are my constitutional and individual liberties."  (*Id*. at 1:13-27.)

Plaintiff and Deputy Bassett then engaged in an argument regarding officer safety versus constitutional rights.  (*Id*. at 1:30.)  During the discussion, Plaintiff recited his military oath and Deputy Bassett attempted to explain that Plaintiff had been detained in handcuffs for officer safety. (*Id*. at 2:15-32.)  Plaintiff insisted Deputy Bassett's safety "does not trump [his] right and [his] liberty;" Deputy Bassett responded, "When I stop you, yes it does."  (*Id*. at 3:26-33.)  The argument about constitutional rights and officer safety continued.  Plaintiff ultimately stated he would not say anything else until a lawyer was present.  (*Id*. at 4:16.)  Deputy Bassett told Plaintiff he was waiting

for backup before un-cuffing him.  Deputy Bassett also advised Plaintiff that his supervisor was on his way, as Plaintiff requested.[6]  (*Id*. at 4:56.)  Defendant Deputy Andazola arrived on the scene at 1:38 p.m.  (Andrews Aff. ¶ 9(t).)  Although not heard on Plaintiff's audio recording of the encounter, Plaintiff alleges, after Deputy Andazola arrived, the deputies' conduct toward him was "aggressive and hostile" and they "threatened" to use a weapon.[7]  (Pierson Dep. at 57:15-25; Pl.'s Resp. to Defs.' First Set of Interrog. and Req. for Produc., Answer to Interrog. No. 6.)  Plaintiff again requested the deputies' supervisor.  (Pl.'s Resp. to Defs.' First Set of Interrog. and Req. for Produc., Answer to Interrog. No. 6.)

Track 3 of Plaintiff's audio recording begins with Deputy Bassett telling Plaintiff again "it's just about being safe."  (Pierson Audio, Track 3 at 0:15.)  Plaintiff responded it was about individual liberties and rights and then stated, "Please don't mistake that I don't care about your safety."  Deputy Bassett's supervisor, Lt. Andrews, arrived shortly thereafter at 1:50 p.m., and Plaintiff reiterated to him, "I don't consent to any searches."  (*Id*. at 0:58-1:03.)  Andrews responded, "ok,

---

[6] In his Affidavit submitted in opposition to the summary judgment motion, Plaintiff states he requested that Deputy Bassett call his supervisor.  (Pierson Aff. ¶ 17) (ECF No. 35-11).

[7] In answer to Defendants' interrogatories, Plaintiff asserts "Defendant Andazola stated that I could go but he would have to train his gun on my back as I drove away."  (Pl.'s Resp. to Defs.' First Set of Interrog. and Req. for Produc., Answer to Interrog. No. 6) (ECF No. 32-5 at 5).  In his Affidavit submitted in opposition to the summary judgment motion, Plaintiff asserts Defendant Bassett told him he "[could] go but my partner will draw his weapon and shoot if there is any sudden movement."  (Pierson Aff. ¶¶ 32-37) (ECF No. 35-11).  Plaintiff asserts Deputy Bassett admitted to saying as much in his deposition, but Plaintiff failed to attach Deputy Bassett's deposition transcript to his brief.  (Pl.'s Memo. in Opp. to Defs.' Mot. for Summ. J. at 5.)

that's fine." (*Id*. at 1:04.)  Andrews explained to Plaintiff that there is no law against open carry of

a firearm, and the person who called about his driving was not willing to sign a complaint at that

point, so Plaintiff would be released to go.  Plaintiff stated that the news was:

> a welcome bit of reason out here.  They have been, considering that they're back and
> forth on their safety, they've done alright.  They haven't really gotten too heated,
> although he was a little aggressive handcuffing me, which is kind of ridiculous in my
> opinion, but, I have no, my only complaint is that I'm not (inaudible).  But as far as
> attitude-wise, it's only that I have no responsibility to tell anybody in this state
> whether or not I have a firearm or any other item, apples, water, or anything else
> that's in my pack or on my person.  I'm not hiding it.  It's on my hip.  It's open carry.
> So, I mean, there's no right, there's no reasonable suspicion of a crime, there's no
> reason to stop me.  I've been here in handcuffs, detained, when they told me I haven't
> committed any crime.  These are huge, huge legal issues.

(*Id*. at 1:25-2:13.)

The handcuffs were then removed and Plaintiff asked what they wanted him to do.  (*Id*. at

2:15.)  Andrews advised Plaintiff he was free to go and Plaintiff then left the scene.  (*Id*. at 3:23.)

Deputy Bassett cleared the units at 2:00 p.m.  (Andrews Aff. ¶ 9(y).)  The entire stop lasted about

37 minutes.  (*Id*. at 3-4.)  Plaintiff was in handcuffs for approximately 35 minutes, with access to his

cell phone and his gun on his hip the entire time, while Deputy Bassett, the lone officer, waited for

backup and a supervisor requested by Plaintiff.

Plaintiff generally asserts claims under 42 U.S.C. §§ 1983 and 1988 for "unlawful stop,

unlawful detention, false arrest, violation of Fourth Amendment rights of freedom from unlawful

searches and seizures, and violation of Second Amendment right to bear arms."  (Compl. at 2.)

Plaintiff's Complaint expressly asserts three causes of action:  first, Plaintiff alleges violation of his

Second Amendment right to bear arms against all Defendants (Compl. at 6-7); second, Plaintiff alleges failure to train and negligent supervision against Lincoln County and Lincoln County Sheriff's Office (Compl. at 7-8); and finally, Plaintiff alleges unconstitutional custom, policy or practice and failure to supervise and train resulting in a violation of Plaintiff's Second and Fourth Amendment rights against Lincoln County and Lincoln County Sheriff's Office (Compl. at 8-11). Plaintiff is not claiming any physical or emotional injuries arising from the incident.  (Pl.'s Resp. to Defs.' First Set of Interrog. and Req. for Produc., Answers to Interrog. Nos. 5, 7 & 8.)  Defendants have jointly moved for summary judgment on all of Plaintiff's claims.

## STANDARD OF REVIEW

Summary judgment is appropriate where a movant shows  "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(a) (2010) (emphasis added).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.   A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotations and citations omitted).

In reviewing a motion for summary judgment, the Court is to determine whether there is evidence to support a party's factual claim, *Jarvis v. Potter*, 500 F.3d 1113, 1120 (10th Cir. 2007), and, in doing so, must view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party, *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir.

2011).  "However, unsupported conclusory allegations do not create a genuine issue of fact."  *Id*.

(internal quotations and citations omitted).  Similarly, a party's own conclusory or self-serving

statements in an affidavit are insufficient to create a genuine dispute of fact.  *See Murray v. City of*

*Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th

Cir. 1991)); *see also Piercy v. Maketa*, 480 F.3d 1192, 1197-98 (10th Cir. 2007) ("When a party

relies on affidavit evidence, it may be insufficient to create a triable fact if it is nonspecific or

otherwise non-responsive, vague, conclusory, or self-serving.").

### DISCUSSION

Although not clearly articulated in his Complaint, Plaintiff brings claims for Second and

Fourth Amendment violations, arguing first that the traffic stop violated his Fourth Amendment right

to be protected from an unreasonable search and seizure.  Second, Plaintiff argues that his

subsequent handcuffing and detention violated either his Second or Fourth Amendment rights and

the individual Defendants are not entitled to qualified immunity.  Finally, Plaintiff argues Lincoln

County and Lincoln County Sheriff's Office ("LCSO") is subject to municipal liability because

LCSO had notice of Deputy Bassett's "unacceptable" rating, LCSO had a widespread practice of

detaining persons legally carrying a firearm, and LCSO ratified the deputies' conduct in relation to

the traffic stop.

A.     *Traffic Stop*

The temporary detention of an individual in connection with the stop of an automobile

constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. U.S.*, 517 U.S. 806, 809-810 (1996). In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court established that law enforcement may stop and temporarily detain a person without probable cause for arrest if the officer has a reasonable and articulable suspicion that the person has committed or may be committing a crime. *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002); *see also United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (traffic stop is valid under Fourth Amendment if based on reasonable articulable suspicion that a traffic violation has occurred). "The Supreme Court has instructed that '[t]he concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules. . . . In evaluating the validity of a [*Terry*] stop . . ., we must consider the totality of the circumstances – the whole picture.'" *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

Citing *McChesney v. State*, 988 P.2d 1071 (Wyo. 1999), Plaintiff argues Deputy Bassett had no legal basis to stop him because the deputy did not observe a traffic violation and failed to otherwise corroborate the "tip" from the complainant. In *McChesney*, an anonymous tipster called in a report that a motorist had been driving erratically. *Id*. at 1073. In evaluating whether the anonymous tip carried sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop, the Wyoming Supreme Court stated:

> The REDDI [Report Every Drunk Driver Immediately] tip in the instant case merely recited the color, make, and direction of travel of the McChesney vehicle. These are facts that were available to anyone traveling on I-90 west of Gillette that July morning. Corroboration of this type of information does not increase the reliability

11

> of the tip.  Where, as here, the informant makes no prediction of future behavior
> indicating "inside information," the investigating officer is required to corroborate
> the tip in some other fashion, usually by observing either a traffic violation or driving
> indicative of impairment.

*Id*. at 1076-77.  The court concluded the anonymous report by itself was not sufficient to create a

reasonable suspicion justifying an investigatory stop.  *Id*. at 1077.  However, the court also

recognized a distinction where, as here, the informant is known.  "The tip of an anonymous

informant is unlike that of an identified citizen-informant.  The latter tips are higher on the reliability

scale because an identified informant exposes himself to possible criminal and civil prosecution if

the report is false." *Id*. at 1076.  *See also Harris*, 313 F.3d at 1235 (quoting *Florida v. J.L.*, 529 U.S.

266, 270 (2000)) ("[u]nlike a tip from a known informant whose reputation can be assessed and who

can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom

demonstrates the informant's basis of knowledge or veracity").

"Where informants are known . . ., a lesser degree of corroboration is required. . . .  The

veracity of identified private citizen informants (as opposed to paid or professional criminal

informants) is generally presumed in the absence of special circumstances suggesting that they

should not be trusted."  *Brown*, 496 F.3d at 1075 (quoting *United States v. Elmore*, 482 F.3d 172,

180 (2nd Cir. 2007)).  The officer in this case knew the name, address and telephone number of the

reporting party who indicated a willingness to sign a complaint.  The citizen informant provided a

detailed description of the motorcyclist and specific information about the motorcyclist's reckless

driving.[8]  Further, the motorcyclist failed to pull over after the officer activated his lights and siren

a short distance from the Idaho border.  Considering the totality of circumstances, the Court finds

no genuine dispute that the information received from Mr. Poulson "bore sufficient indicia of

reliability" to generate a reasonable suspicion justifying Deputy Bassett's stop of Plaintiff.  *Id.*

(internal quotations and citation omitted).

B.      *Scope of Detention*

        "In evaluating the reasonableness of an investigative detention [or traffic stop], [the court]

make[s] a dual inquiry, considering first 'whether the officer's action was justified at its inception,'

and second 'whether it was reasonably related in scope to the circumstances which justified the

interference in the first place.'  *Terry*, 392 U.S. at 20.  'The government has the burden of

demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was

sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'

*United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)."  *Shareef*, 100 F.3d at 1500-01.  "An

officer conducting a routine traffic stop may request a driver's license and vehicle registration, run

_____

        [8] Plaintiff argues Mr. Poulson's statements to the dispatcher and the audio recording thereof are
inadmissible hearsay pursuant to F.R.E. 801(c).  The Court disagrees that the 911 call is being provided
to prove the truth of the matter asserted.  Rather, it is offered to establish the information relied on by
Deputy Bassett in initiating the traffic stop.  *See United States v. Hinson*, 585 F.3d 1328, 1336 (10th Cir.
2009) ("[o]ut-of-court statements can be admitted as background for an investigation [] if they provide
information that is necessary to explain the government's subsequent actions").  Even so, the Court finds
the audio recording admissible as a present sense impression which is an exception to the rule against
hearsay.  F.R.E. 803(1); *United States v. Allen*, 235 F.3d 482, 493 (10th Cir. 2000).  Nor does the Court
find merit in Plaintiff's bald assertion that the 911 call lacks foundation and is speculative.

a computer check, and issue a citation." *Id*. at 1501.  Further, the content of police questions during a lawful traffic stop, including a question about the presence of weapons, does not implicate the Fourth Amendment as long as those questions do not prolong the detention.  *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

The Court has already determined the stop was justified at its inception.  Also, it cannot be said that Deputy Bassett's question about whether Plaintiff had any weapons, in itself, appreciably extended the length of the detention.  Rather than simply answer the question, Plaintiff inexplicably responded that he doesn't consent to any searches at the same time Deputy Bassett noticed the gun on Plaintiff's hip as Plaintiff dismounted from his motorcycle.  Plaintiff's odd behavior raised safety concerns for the lone officer stopping a man with a gun, in a rural area with no cover, who had reportedly been driving recklessly and committing traffic violations.  "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.'"  *Perdue*, 8 F.3d at 1462 (1993) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  "The use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest – for which probable cause is required – when the circumstances reasonably warrant such measures."  *Shareef*, 100 F.3d at 1502 (internal quotations and citation omitted).

The Court finds, under the totality of circumstances present here, it was reasonably necessary

for Deputy Bassett to place Plaintiff in handcuffs for officer safety after he was surprised by seeing

the gun on Plaintiff's hip.  The Court further finds Plaintiff's inconsistent, and apparently disputed,

assertion that the deputies threatened violence against him insufficient to establish an unreasonable

seizure.   Courts have concluded that handcuffing, placing suspects on the ground, using or

threatening to use force, and even the drawing of weapons (which did not occur here) does not

necessarily elevate a lawful stop into a custodial arrest.  *See Cortez v. McCauley*, 478 F.3d 1108,

1130 (10th Cir. 2007); *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995).  The singular

"threat" allegedly uttered by either Deputy Bassett or Deputy Andazola during the course of the

argumentative discussion between Plaintiff and the deputies does not make the scope of the stop

unlawful.[9]

Plaintiff insists he did not act dangerous or suspicious at any time during the stop and Deputy

Bassett's safety was not in jeopardy.  However, such assurances may be of little consolation to an

officer in the field.  In assessing whether an officer used more force than necessary to effect an

investigatory stop, one federal district court explained:

> A police officer should be able to conduct an investigation without any threats or
> potential threats to his safety or that of others.  Indeed, it would be fatuous to suggest
> that a police officer could not take action to "neutralize" any threats or potential
> threats to his safety or that of others during the course of a legitimate police inquiry

---

[9] Although Plaintiff does not expressly assert a claim for excessive force, the Court finds the Defendant Deputies used only the "degree of physical coercion or threat thereof" necessary to effect the investigatory stop." *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.")).

or detention. *See Terry v. Ohio*, 392 U.S. 1, 24 (1968). Given the facts and circumstances of this case, a reasonable police officer could have believed that it was necessary to disarm [the detainee] for safety reasons while he conducted his investigation, *even though the pistol remained in [his] hip pocket at all times*. A gun in one's hip pocket certainly can pose a threat to a law enforcement officer's safety because the gun could be pulled out and used in a matter of seconds. A reasonable police officer certainly could have concluded that the use of force was necessary under the facts of this case as long as [the detainee] had a weapon in his immediate possession. Regardless of any subjective intent or motive on [the officer's] part, a reasonable officer could have believed that the force [the officer] used was necessary to effect the investigatory stop.

*Thomas v. Murray*, 107 F.Supp.2d 748, 758 (N.D. Tex. 2000) (emphasis in original).

The Court also finds the length of the detention reasonable, even accepting Plaintiff's assertion that it lasted 45 minutes.[10] In light of the tense and argumentative dialogue that ensued between Plaintiff and Deputy Bassett following the cuffing of Plaintiff's hands, it was reasonable for Deputy Bassett to wait for backup before un-cuffing Plaintiff, particularly because Plaintiff was allowed to keep his weapon on his hip throughout the stop. Plaintiff was not placed in a patrol car nor was he handled roughly during the wait. Moreover, Plaintiff requested a supervisor be called to the scene. "When a [person]'s own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable." *Shareef*, 100 F.3d at 1501. Under such circumstances, a 45-minute stop in rural Wyoming is not unreasonable. Less than 10 minutes elapsed from the time the requested supervisor arrived on scene and Plaintiff was released. The Court finds no genuine dispute that the Plaintiff's detention was sufficiently limited in scope and duration to satisfy the

---

[10] As set forth previously, the dispatch times obtained from the server recording of the incident establish the stop lasted approximately 37 minutes.

conditions of an investigative seizure.

C.     *Plaintiff's Claim of Unreasonable Seizure for Open Carrying a Firearm*

Plaintiff attempts to assert claims for violation of his Second and Fourth Amendment rights, alleging "Deputy Bassett could not justify seizing and detaining [Plaintiff] because of his handgun." (Pl.'s Memo. in Opp. to Mot. for Summ. J. at 23.)   In support, Plaintiff relies on and cites lengthy excerpts from *St. John v. McColley*, 653 F.Supp.2d 1155 (D.N.M. 2009).   In *St. John*, a moviegoer was escorted out of a theater and patted down by police officers in response to a call from the theater manager that Mr. St. John was carrying a holstered handgun which was making other patrons nervous.   *St. John*, 653 F.Supp.2d at 1157.   The court specifically stated:

> The undisputed facts establish that Mr. St. John's seizure was unreasonable. Defendants lacked a justifiable suspicion that Mr. St. John had committed a crime, was committing a crime or was about to commit a crime.   Indeed, Officer McColley conceded that he did not observe Mr. St. John committing any crimes and that he arrived at the theater with the suspicion that Mr. St. John was merely "showing a gun", . . . which is not illegal in the State of New Mexico.   *See* N.M. Stat. § 30-7 *et seq*.   Nor was there any reason to believe that a crime was afoot.   When they found him, Mr. St. John was peacefully sitting through the previews for his second movie of the day.   Officers had no reason to believe that Mr. St. John had been, was, or would be involved in any criminal activity whatsoever.
> * * *
> Moreover, Mr. St. John's lawful possession of a loaded firearm in a crowded place could not, by itself, create a reasonable suspicion sufficient to justify an investigatory detention.
> * * *
> The Tenth Circuit has also dealt with this question.   In *United States v. King*, 990 F.2d 1552 (10th Cir.1993) the Tenth Circuit found that an investigatory detention initiated by an officer after he discovered that the defendant lawfully possessed a loaded firearm lacked sufficient basis because the firearm alone did not create a reasonable suspicion of criminal activity.   In *King*, an Albuquerque police officer

seized and searched King when, concerned that King's honking would cause an accident, he approached King's vehicle and observed a loaded firearm under King's thigh. *Id*. at 1555. Recognizing that King was allowed to carry a loaded, concealed firearm in his vehicle under New Mexico law, the court explained that – in light of the legality of King's actions – permitting such detentions would render the Fourth Amendment functionally meaningless:

> In a state such as New Mexico, which permits persons to lawfully carry firearms, the government's argument [that the officer's investigatory detention of defendant was justified by concern for his safety and the safety of bystanders] would effectively eliminate Fourth Amendment protections for lawfully armed persons. Moreover, the government's "reasonableness" standard would render toothless the additional requirement that the scope and duration of detention be carefully tailored to its underlying justification. For example, if a police officer's safety could justify the detention of an otherwise lawfully armed person, the detention could last indefinitely because a lawfully armed person would perpetually present a threat to the safety of the officer.

*King*, 990 F.2d at 1559 (internal citations and quotations omitted).

*St. John*, 653 F.Supp.2d at 1161-62.

*St. John* and *King* are easily distinguishable. If all Deputy Bassett knew at the time he initiated the traffic stop was that Plaintiff was carrying a pistol on his belt, then perhaps this case would be analyzed differently. However, it is undisputed Plaintiff was stopped based on a report of reckless driving from a known citizen-informant,[11] and Deputy Bassett was surprised upon discovering Plaintiff was carrying a weapon. Plaintiff's non-responsive answer to Deputy Bassett's

---

[11] In his deposition, Plaintiff was asked: "Did anyone from Lincoln County Sheriff's Department state that you were pulled over because you were openly carrying a firearm?" Plaintiff responded: "No, it was not the reason I was pulled over." (Pierson Dep. 22:10-13.)

inquiry regarding weapons further contributed to officer safety concerns.  As discussed above, the Court finds the investigatory stop and detention of Plaintiff was reasonable and not violative of Plaintiff's Second or Fourth Amendment rights.

D.      *Qualified Immunity*

        Generally, government employees are immune from liability for their discretionary actions if their conduct is reasonable in light of clearly established law and the information that the employees possessed at the time of their actions.  *Davis v. Scherer*, 468 U.S. 183, 190 (1984); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   In other words, "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [] confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right."  *Cortez*, 478 F.3d at 1114 (citing *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir.2004)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Having determined, *supra*, that the circumstances here do not establish a violation of Plaintiff's constitutional rights, the Court finds Defendant Deputies Bassett and Andazola are entitled to qualified immunity.

E.      *Municipal Liability*

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.  Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions-and the basis for them-of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Id.*  Plaintiff has failed to identify any action taken pursuant to official policy, practice or custom that caused the alleged constitutional violation(s).  Rather, Plaintiff argues municipal liability should be imposed based on: (1) failure to train or supervise; (2) a widespread practice of detaining persons legally carrying a firearm; and (3) ratification of the deputies' allegedly unconstitutional conduct. Plaintiff submits little or no evidence or authority in support of such claims.  Regardless, the Court has determined the officers did not violate any of Plaintiff's constitutional rights; therefore, no municipal liability against the County or Sheriff's Office can be imposed.  *See Thomson v. Salt Lake County*, 584 F.3d 1304, 1322 (10th Cir. 2009) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) ("[None] of our cases authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm.")).

20

**CONCLUSION**

For the reasons discussed herein, the Court finds no *genuine* dispute as to any *material* fact and Defendants are entitled to judgment as a matter of law.   THEREFORE, it is hereby

ORDERED   that   Defendants' *Joint Motion for Summary Judgment* (ECF No. 31) is GRANTED.

Dated this 22nd day of January, 2013.

_____

Scott W. Skavdahl
United States District Judge